# UNITED STATES DISTRICT COURT

for the

Central District of California



ORIGINAL

FILED
CLERK, U.S. DISTRICT COURT

AUG 1 6 2019

CENTRAL DISTRICT OF CALIFORNIA
BY ___DC___ DEPUTY

United States of America

v.

Victor Manuel Borjas-Madrid
Guadalupe Munguia and
Francisco Barraza

Defendants.

Case No.  **ED19-0442M**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about August 15, 2019, in the County of Riverside in the Central District of California, the defendant(s)

violated:

| Code Section | Offense Description |
|---|---|
| Title 21, U.S.C., Sections 841(a)(1), (b)(1)(A) | See Attachment |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Kristopher Templin, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  08/16/2019

_____
*Judge's signature*

City and state:  Riverside, California

Hon. Shashi H. Kewalramani, U.S. Magistrate Judge
*Printed name and title*

per Fed. R. Crim. P
4.1

DH
AUSA: Douglas Hansen/GH

### AFFIDAVIT

I, Kristopher Templin, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against Victor Manuel Borjas-Madrid ("BORJAS"), Guadalupe Munguia ("MUNGUIA"), and Francisco Barraza ("BARRAZA") for violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) (Possession with Intent to Distribute a Controlled Substance).

2.    This affidavit is also made in support of an application for a warrant to search the following digital devices in the custody of Homeland Security Investigations, in San Bernardino, California (collectively, the "SUBJECT DEVICES"), as described more fully in Attachment A:

      a.   Samsung Galaxy S81 S/N R58J6LFGAL ("SUBJECT DEVICE 1");

      b.   LG Stylo 4 S/N 901CYSF1120542("SUBJECT DEVICE 2");

      c.   Android S/N Y9C211004769 ("SUBJECT DEVICE 3");

      d.   iPhone 10 (yellow) ("SUBJECT DEVICE 4");

      e.   Black TCL SmartPhone ("SUBJECT DEVICE 5");

      f.   LG Smartphone ("SUBJECT DEVICE 6"); and

      g.   iPhone 10, yellow ("SUBJECT DEVICE 7").

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances and distribution of controlled substances)

and 846 (conspiracy and attempt to distribute and possess with intent to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.    Your affiant is a Special Agent (SA) employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), assigned to the HSI Riverside/San Bernardino office.  I have been employed as a Special Agent since September 2018.  I completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center, which included multiple courses on federal immigration violations and false document crimes.  Prior to becoming a Special Agent, I was employed as a United States Border Patrol (USBP) Agent for 10 years in El Centro, California.  I attended the Border Patrol Agent Academy at the Federal Law Enforcement Training Center, where I received

intensive instruction in areas such as Immigration and Customs Law and narcotics and human smuggling. I have conducted initial arrests and investigations of criminal and administrative alien smuggling cases since February of 2008. From 2014 to 2018 I was an Intelligence Agent for the Border Patrol. As an Intelligence Agent, I received advanced training on the detection and interdiction of alien and narcotics smuggling. I conducted numerous investigations that led to probable cause arrests of smugglers transporting large shipments of methamphetamine, cocaine, heroin and fentanyl. I also interdicted and arrested multiple smugglers attempting to smuggle bulk currency, proceeds from narcotics trafficking, to Mexico. In 2007, I received a Bachelor of Science in Psychology from the California State University, San Marcos.

6.     As a SA, I have participated in multiple narcotics investigations at the federal and state level, including numerous controlled deliveries, drug interdictions, possession with intent to distribute and possession of narcotics investigations. In conducting these investigations, I have utilized a variety of investigative techniques and resources, including physical and electronic surveillance and various types of informants and cooperating sources.

## III. SUMMARY OF PROBABLE CAUSE

7.     Beginning in May of 2019, Homeland Security Investigations (HSI) New Jersey began an investigation into a Drug Trafficking Organization (DTO) operating in the New Jersey area. A Confidential Source ("CS") received information that a

3

subject known as "COMPA" was facilitating the movement of methamphetamine from California into New Jersey.  HSI New Jersey arranged for a CS to make contact with COMPA.

8.   In June of 2019, COMPA sent three shipments of narcotics by UPS and FedEx to the CS in New Jersey.  In total, HSI New Jersey seized 35 pounds of crystal methamphetamine from those shipments.  The CS and COMPA agreed to meet in Corona, CA on or about August 14, 2019 for the CS to pay for the crystal methamphetamine and discuss a new sale where COMPA would provide the CS with 40 kilograms of fentanyl and 50 pounds of methamphetamine.

9.   On August 15, 2019, the CS and COMPA met in Corona, CA for COMPA to deliver the fentanyl and methamphetamine.  At that meeting, HSI Riverside and HSI New Jersey agents arrested COMPA (identified as BORJAS) and two couriers, MUNGUI and BARRAZA.

10.  HSI agents recovered a total of 31.96 kilograms of fentanyl and 11.52 kilograms of methamphetamine from a car driven by BORJAS.  MUNGUIA and BARRAZA agreed to speak to HSI agents and admitted that they knew the packages they were bringing to the meeting contained narcotics.

## IV. STATEMENT OF PROBABLE CAUSE

11.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.   CASE BACKGROUND IN NEW JERSEY

12.  In or about approximately May 2019, HSI New Jersey began an investigation into a DTO operating in New Jersey.  The

investigation revealed that the DTO distributed large quantities of controlled substances, including crystal methamphetamine, in and around Burlington, Gloucester, and Atlantic Counties, New Jersey.  The investigation included the use of a CS who provided law enforcement with information regarding the DTO's criminal activities, including the sale of controlled substances.

13.  Also in May 2019, law enforcement received information from the CS that an individual by the name of "COMPA," later identified as BORJAS, was known to facilitate the transport of large amounts of narcotics from California into New Jersey. Based on this information, HSI commenced an investigation of BORJAS and, in furtherance of that investigation, arranged for a CS to make contact with BORJAS.

14.  Beginning in approximately May 2019 and continuing through on or about August 15, 2019, the CS communicated with BORJAS through recorded phone conversations and texts messages about purchasing large quantities of narcotics from BORJAS in California to be shipped to the CS in New Jersey.

1.  First Shipment

15.  On or about June 3, 2019, HSI New Jersey received information that the DTO was going to send approximately 10 pounds of crystal methamphetamine to the CS using a mail service.  HSI New Jersey provided the CS with an address to pass onto the DTO for delivery of the crystal methamphetamine.

16.  On or about June 4, 2019, HSI New Jersey received information that the DTO was going to send approximately 10 pounds of crystal methamphetamine concealed in a package using

5

Federal Express.  The DTO provided a tracking number
(#470724069095) and informed the CS the cost was $7,500 per
pound.  HSI New Jersey received information that a
representative from the DTO would be flying into the area to
collect the money.

17.  On or about June 6, 2019, HSI New Jersey received a
Federal Express package with tracking number 470724069095.  The
package contained two large cylinder cans.  Inside the cans, law
enforcement discovered two large food saver bags, containing
approximately 10 pounds of suspected crystal methamphetamine.
HSI New Jersey field-tested a sample of the substance inside one
of the packages and it tested positive for the presence of
methamphetamine.

18.  On or about June 6, 2019, HSI New Jersey arrested a
DTO representative, Jorge PICOS MONARES, who was attempting to
collect payment for 10 pounds of suspected crystal
methamphetamine.

2.  Second Shipment

19.  Following this meeting, BORJAS and the CS continued to
exchange phone calls and text messages in which BORJAS agreed to
send an additional two parcels of methamphetamine from
California to the CS in New Jersey.  BORJAS informed the CS that
he would send the narcotics from California to New Jersey hidden
inside a parcel via mail courier services.

20.  On or about June 10, 2019, BORJAS arranged to send the
CS a UPS parcel, tracking # 1Z6Y24W1PW98889281.  The parcel was
addressed from Steven Alvarez, at 13011 Florence Avenue, Santa

Fe Springs, California 90674 and addressed to Brigantine, New
Jersey.  HSI New Jersey seized the parcel, which was found to
contain 10 pounds of suspected crystal methamphetamine concealed
in cylinder cans.  HSI New Jersey field-tested a sample of the
substance inside one of the packages and it tested positive for
the presence of methamphetamine.

        3.   Third Shipment

    21.  On or about June 17, 2019, BORJAS arranged to send the
last of three parcels to the CS via UPS parcel tracking
# 1z6y24w1pw9521.  The parcel was sent from Robert Hernandez,
14912 Imperial Hwy, La Mirada, California 90638 addressed to
Hamilton, New Jersey.  HSI New Jersey intercepted the parcel,
which was found to contain approximately 15 pounds of suspected
crystal methamphetamine concealed again in the same type of
cylinder cans.  HSI New Jersey field-tested a sample of the
substance inside one of the packages and it tested positive for
the presence of methamphetamine.  Since the beginning of this
investigation, New Jersey has seized a total of 35 pounds of
crystal methamphetamine from three parcels.

        4.   Planned Meeting in California

    22.  The CS remained in contact with BORJAS by telephone
after the delivery of the three parcels.  BORJAS expected the CS
to travel to California to pay BORJAS for the 35 pounds and to
negotiate the sale of additional narcotics.

    23.  On or about July 16, 2019, BORJAS informed CS that the
CS could stay at the Holiday Inn located 1550 Circle City Drive,
Corona, California 92879.  BORJAS told the CS that the Holiday

Inn is close to the DTO operation.  BORJAS informed the CS that BORJAS was in possession of 40 kilograms of fentanyl and 50 kilograms of crystal methamphetamines for CS to purchase.

24.  The CS and BORJAS agreed to meet in person in California on or about August 14, 2019, at which point the CS would pay BORJAS approximately $262,500 for the methamphetamine the CS had already received.  In addition, BORJAS would also facilitate the sale of fentanyl and crystal methamphetamine to the CS.  In total, BORJAS was anticipating approximately $1.5 million (U.S.) for all the narcotics.

**B.   AUGUST 14: MEETING AND CALLS**

25.  On August 14, 2019, BORJAS and the CS met at approximately 12:30 p.m. at BJ's Restaurant in Corona, CA.  HSI agents observed the CS.  Utilizing video and audio recording devices provided by HSI New Jersey, HSI agents recorded the meeting and the conversation.  During this meeting, BORJAS and the CS discussed the prior shipments of crystal methamphetamine to New Jersey and the arrest of PICOS MONARES in New Jersey.

26.  During this meeting, BORJAS and the CS also discussed the sale of the additional narcotics.  BORJAS told the CS that the narcotics were arriving soon and were being delivered by three separate groups.  The first group would bring 15 kilograms of fentanyl, the second group would bring 25 kilograms of fentanyl, and the third group would bring 25 pounds of crystal methamphetamine instead of the initial 50 pounds discussed.

27.  The CS and BORJAS walked to the CS's car so that BORJAS could view the currency.  The CS opened the trunk of his

rental vehicle and showed BORJAS a black duffel bag containing $450,000 in sham US currency provided by HSI New Jersey. The meeting was concluded at approximately 2:00 p.m. and BORJAS told the CS that the narcotics would arrive in approximately an hour and a half.

28. BORJAS left the restaurant in a White Honda bearing California license plate 7KDC191 and drove northbound on I-15. HSI Riverside agents and officers from the Inland Narcotic Crackdown Alliance Taskforce (INCA) maintained surveillance on BORJAS. BORJAS arrived at 2368 Manzanita, Corona, California and went into the residence. At approximately 4:30 p.m., the CS called BORJAS to ask for a status update on the delivery. BORJAS indicated the couriers were stuck in traffic so BORJAS and the CS agreed to meet the following morning.

**C. AUGUST 15: ARRESTS OF BORJAS, MUNGUIA, AND BARRAZA**

1. Pre-Arrests

29. On August 15, 2019, BORJAS and the CS agreed to meet at the Chick-fil-A restaurant located at 450 Hidden Valley Parkway in the city of Corona, California at approximately 8:30 a.m. BORJAS told the CS that he would have all of the narcotics ready for that meeting.

30. At approximately 8:55 a.m., BORJAS arrived at the Chick-fil-A restaurant driving the same White Honda Accord he was observed in the day before. At that time BORJAS was observed wearing a blue shirt and blue jeans. The CS and BORJAS met for a short time, then BORJAS drove his vehicle further away from the CS in the same parking lot. The CS informed HSI agents

that BORJAS was waiting for several couriers to bring portions
of the total narcotics load to BORJAS at that parking lot.  The
CS informed HSI agents to expect three separate couriers.

31.  At approximately 9:20 a.m., BORJAS met with an
unidentified male ("UM") driving a black Dodge Charger bearing
Arizona license plate CGT0511.  The UM got into the passenger
side of BORJAS's vehicle.  The agents did not see the UM provide
any packages to BORJAS.  After a short conversation, the UM
returned to his vehicle and left the area.

32.  At approximately 9:25 a.m., a silver Toyota Tacoma
extended cab bearing California license 58909M1 arrived at the
location and met with BORJAS.  The Tacoma was occupied by two
unidentified Hispanic males.  The driver of the Tacoma retrieved
a parcel from the back of the extended cab and placed it into
the backseat of BORJAS's Honda.  The Tacoma then left the area.

33.  At approximately 9:45 a.m., HSI observed BORJAS park
his vehicle next to a Chrysler Sebring bearing California
license 8GQS662.  A Hispanic male in a gray shirt, later
identified as BARRAZA, exited the Sebring and met with BORJAS.
BARRAZA was the sole occupant of the Sebring vehicle and was the
driver.  BARRAZA opened the trunk of the Sebring, retrieved a
large, black plastic container, and handed it BORJAS.  BORJAS
placed the plastic container in the backseat of his car.  The
Sebring remained in the parking lot.

34.  At approximately 9:50 a.m., HSI observed BORJAS walk
over to a Toyota Metrix bearing California license plate 6AIF837
and spoke briefly with the driver of the vehicle.  BORJAS

retrieved a red and white shopping bag and plastic bag from the back of the Metrix and placed them into the backseat of his Honda. The Metrix remained in the parking lot. MENGUIA was the sole occupant and driver of the Metrix.

       2.  <u>Post-Arrests</u>

35. At approximately 9:50 a.m., BORJAS told the CS that BORJAS was in possession of all the narcotics. The CS met with BORJAS at the Honda to visually confirm the presence of narcotics bundles. The CS looked into the back of the Honda and saw bundles of what the CS believed to be narcotics. The CS called HSI New Jersey agents who communicated with HSI Riverside that the narcotics were in the Honda. HSI agents arrested BORJAS, MUNGUIA, and BARRAZA at approximately 9:55 a.m.

36. BORJAS was in possession of two cellular telephones at the time of his arrest, which were found in the Honda he was driving. MUNGUIA was in possession of three cellular telephones, which were found in the front seat of the Toyota Metrix. BARRAZA was in possession of two (2) cellular telephones, which were found in the Chrysler Sebring. Additional information regarding these digital devices, including in whose possession they were found, is set forth below.

37. The black plastic container was found in the backseat of the Honda. The container was searched by HSI Riverside agents and found to contain 13 plastic wrapped bundles of what appeared to be narcotics.

38.   The red and white shopping bag and white plastic bag were also found in the backseat of the Honda.   The red and white shopping bag contained eight bundles of what appeared to be narcotics.   The white plastic bag contained 3 bundles of what appeared to be narcotics.

39.   HSI Riverside agents also found a camouflage backpack, a red tent bag in the backseat of the Honda.   The red tent bag contained 5 plastic wrapped bundles.   The camouflage backpack contained 13 plastic wrapped bundles of suspected narcotics.

40.   The narcotics, phones, and all subjects were transported to the HSI San Bernardino office.

**D.   INTERVIEWS AND FIELD TEST**

1.   <u>MUNGUIA</u>

41.   At approximately 12:39 p.m., HSI SA Shane Van Gundy and Group Supervisor (GS) Chris Bracken conducted an interview of MUNGUIA.   SA Van Gundy read MUNGUIA her Miranda rights in the English language.   MUNGUIA acknowledged that she understood her Miranda rights and agreed to speak to SA Van Gundy and GS Bracken without the presence of an attorney.   In sum, MUNGUIA stated the following.   MUNGUIA speaks English fluently.

42.   MUNGUIA stated that she was contacted through WhatsApp several days prior to August 15, 2019 by an ex-boyfriend named "Carlos" (last name unknown).   Carlos asked her how she was doing and if she needed money.   MUNGUIA replied that she did need money and Carlos offered her $500 to deliver "parts" to an unknown subject.   MUNGUIA asked Carlos if it was anything

illegal.  Carlos responded that she would be delivering drugs,
but MUNGUIA was not aware what kind of drugs.

43.  On August 14, 2019, Carlos told MUNGUIA to be ready to
pick something up the following morning and that someone would
contact her.  In the evening of August 14, MUNGUIA received a
call from an unknown person who directed her to meet in the city
of Compton, CA early the next day.

44.  At approximately 6:30 a.m. on August 15, 2019, MUNGUIA
met with an unidentified male at a laundromat on Rosecrans
Avenue, Compton. The unidentified male put the narcotics into
her vehicle and MUNGUIA left the area.

45.  Several hours later, MUNGUIA met with another unknown
male at a parking lot of a Ross store near the location she was
arrested.  Based on HSI New Jersey's conversations with the CS,
who was in contact with BORJAS, this location is believed to be
the Ross store at 2519 Tuscany St, Corona, California and
according to CS conversations with BORJAS the time was between
8:00 and 8:30 a.m.  MUNGUIA did not know the name of the
subject, but identified him as one of the persons she was
arrested with, who was wearing a blue shirt.  Based on his
observations of the transaction, MUNGUIA was describing BORJAS,
who was wearing a blue shirt at the time of his arrest.

46.  BORJAS told MUNGUIA that the meeting location was
going to be moved and that she could get in her car or follow
him to the new location.  MUNGUIA followed BORJAS in her Toyota
Metrix and parked in the lot near the Chick-fil-A on Hidden
Valley Parkway in the city of Corona, California.  BORJAS

removed the bags from her vehicle and put them in his vehicle. BORJAS told her that he would bring something back to her after he met with another person.  Shortly thereafter, MUNGUIA was arrested.

47.  MUNGUIA stated that she has not previously delivered narcotics.  When MUNGUIA was arrested, she was in possession of three cellular telephones (SUBJECT DEVICES 1, 2 and 3) which were found in the Toyota Metrix.

2.  BARRAZA

48.  On August 15, 2019, at approximately 12:33 P.M., HSI SA Kristopher Templin and SA Fabian Sanchez conducted a custodial interview of BARRAZA.  BARRAZA was advised of his Miranda rights and agreed to answer questions without the presence of an attorney. BARRAZA speaks English fluently.

49.  BARRAZA stated that on the morning of August 15, 2019 he was contacted by phone by a man he only knows as "Alfonzo." Alfonzo instructed BARRAZA drive to Corona, California in order to deliver a box to a man named "Compa" (later identified as BORJAS).  BARRAZA was instructed to drive to Corona, California, and receive narcotics from an unknown man.  Once he received the narcotics, he was to deliver the narcotics to Compa.  BARRAZA stated that when he arrived in Corona, Alfonso instructed BARRAZA via phone to receive a box from an unknown man.

50.  BARRAZA stated that approximately 30 minutes prior to his arrest, he received the box from an unknown man.  The unknown man delivered the box to BARRAZA in the parking lot near the Chick-fil-A.  BARRAZA did not open the box.  BARRAZA stated

that he believed he was transporting illegal narcotics and he was to be paid $100 dollars for his work.

51. BARRAZA stated that today was his second time delivering narcotics. BARRAZA said that he previously delivered a package that he suspected to be narcotics to an unknown man in Hesperia, California, and was paid $150 dollars. When BARRAZA was arrested he was in possession of two (2) cellular telephones (SUBJECT DEVICES 4 and 5) which were found in Chrysler Sebring.

### 3. BORJAS

52. When BORJAS was arrested, he was in possession of two (2) cellular telephones (SUBJECT DEVICES 6 and 7) which were found in the white Honda.

### 4. Weighing and Field Testing of Narcotics

53. The narcotics were weighed by SA Templin and SA TRUDEL. The black container held 13 packages weighing a total of 11.52 kilograms (including packaging). One of the parcels was tested using a narcotics field test kit and was found to be positive for the presence of methamphetamine.

54. The red and white shopping bag contained 8 plastic wrapped bundles, believed to be fentanyl, weighing 8.46 kilograms (including packaging).

55. The white plastic bag contained 4 plastic wrapped bundles, believed to be fentanyl, weighing 4.26 kilograms (including packaging).

56. The red tent bag contained 5 plastic wrapped bundles, believed to be fentanyl, weighing 5.4 kilograms (including packaging).

57.   The camouflage backpack contained 13 plastic wrapped bundles, believed to be fentanyl, weighing 13.86 kilograms (including packaging).   SA Trudel conducted a field test using a narcotics test kit of one of the parcels found in the backpack. The test returned a positive result for the presence of fentanyl.

## V.   TRAINING AND EXPERIENCE ON DRUG OFFENSES

58.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.   Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.   The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications,

16

sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e.    Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

f.    Particular to this investigation, there are numerous potential co-conspirators who could be identified through a search of cellular telephones of individuals who participated in the drug distribution activities of this DTO.

g.    The CS has been communicating through voice calls and text messages with BORJAS since May of 2019.  During that time, BORJAS has used two (2) separate phone numbers. Also during that time, BORJAS has been communicating with other unknown persons to arrange for the delivery of narcotics that

occurred on August 15, 2019 including the unknown individuals in the Toyota Tacoma and Dodge Charger who were observed delivering narcotics but not arrested. Information and communications stored in SUBJECT DEVICES 6 and 7 could assist law enforcement officers in the identification of those co-conspirators.

h.   MUNGUIA stated in her interview that she was contacted on her cellular phone by a man known as "Carlos" through WhatsApp chat and that Carlos arranged for her involvement in the events of August 15. Additionally, MUNGUIA exchanged calls and text messages with BORJAS and an unknown male in Compton, CA to pick up and deliver narcotics. Information in MUNGUIA's cellular phones could be used to assist law enforcement in identifying Carlos and the male in Compton. Additionally, MUNGUIA admitted to having contact with BORJAS through her cellular telephone and the information in their text conversations and call history are evidence of the events of August 15.

i.   BARRAZA also admitted to having contact with unknown persons who helped arrange the narcotics transaction. Information contained in SUBJECT DEVICES 4 and 5 could assist law enforcement with the identification of those persons. Additionally, it is reasonable that BARRAZA and BORJAS would have exchanged some sort of communications prior to meeting and that those communications would be evidence related to the events of August 15.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

59.   As used herein, the term "digital device" includes the SUBJECT DEVICES.

60.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable

19

data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

61. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a short period of time for a number of reasons, including the following:

        a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which

may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

c.   There are seven (7) total SUBJECT DEVICES that may contain evidence related to this investigation.  The large number of digital devices relevant to this investigation, as well as the large amounts of data that each digital device can store, will make a thorough search of the devices especially time consuming for law enforcement.  Additionally, law enforcement only has the pass codes for two (2) of the devices.  The programs utilized by law enforcement to open phones operate slowly and in some circumstances, additional assistance must be requested from the manufacturer to open the device which causes further delay.

62.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To

unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress BORJAS's, MUNGUIA's, BARRAZZA's thumb- and/or fingers on the devices; and (2) hold the devices in front of BORJAS's, MUNGUIA's, BARRAZZA's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

63.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

64.   For all of the reasons described above, there is probable cause to believe that BORJAS, MUNGUIA, and BARRAZA have committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled § and 21 U.S.C. 846: Conspiracy to Distribute a Controlled Substance.   There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A

KRISTOPHER TEMPLIN
Special Agent
Homeland Security
Investigations

Subscribed to and sworn before me this _16th_ day of August, 2019.

UNITED STATES MAGISTRATE JUDGE
Shashi H. Kewalramani per Fed. R. Crim. P. 4.1

23

**ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following digital devices (the "SUBJECT DEVICES"), seized on August 15, 2019 and currently maintained in the custody of Homeland Security Investigations in San Bernardino, California:

    1.    Samsung Galaxy S81 S/N R58J6LFGAL ("SUBJECT DEVICE 1")

    2.    LG Stylo 4 S/N 901CYSF1120542 ("SUBJECT DEVICE 2")

    3.    Android S/N Y9211004769 ("SUBJECT DEVICE 3")



    4.    iPhone 10, Yellow ("SUBJECT DEVICE 4")

    5.    Black TCL Smart Phone ("SUBJECT DEVICE 5")



i

6.      LG Smartphone ("SUBJECT DEVICE 6")

7.      iPhone 10, Yellow ("SUBJECT DEVICE 7")



**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances and distribution of controlled substances) and 846 (conspiracy and attempt to distribute controlled substances)(the "Subject Offenses"), namely:

a.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

b.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which concern the above-named violations;

c.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which concern the above-named violations;

d.    Records, documents, programs, applications, materials, or conversations relating to the trafficking of drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed;

e.    Audio recordings, pictures, video recordings, or still captured images concerning the purchase, sale, transportation, or distribution of drugs;

f.    Contents of any calendar or date book;

g.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

h.    Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

i.    With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.    evidence of the presence or absence of software that would allow others to control the device, such as

viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

        iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

        v.   evidence of the times the device was used;

        vi.  passwords, encryption keys, and other access devices that may be necessary to access the device;

        vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

        viii.    records of or information about Internet Protocol addresses used by the device;

        ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.  **SEARCH PROCEDURE FOR THE SUBJECT DEVICE(S)**

3.   In searching the SUBJECT DEVICES (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of the SUBJECT DEVICE(S) as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital device(s) beyond this 120-day period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also

iv

search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

       ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

       iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

       e.  If the search team, while searching a SUBJECT DEVICE, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that SUBJECT DEVICE pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

       f.  If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

       g.  If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized,

the government may make and retain copies of such data, and may access such data at any time.

        h.   If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

        i.   The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

        j.   After the completion of the search of the SUBJECT DEVICE(S), the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

        4.   During the execution of this search warrant, law enforcement is permitted to (1) depress BORJAS's, MUNGUIA's, BARRAZZA's thumb- and/or fingers onto the fingerprint sensor of the SUBJECT DEVICES (only if the device has such a sensor), and direct which specific fingers and/or thumbs shall be depressed; and (2) hold the device in front of BORJAS's, MUNGUIA's, BARRAZZA's face with his or her eyes open to activate the

facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

5.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.